United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIOGENEX LABORATORIES,<br><br>    Plaintiff,<br><br>  v.<br><br>SENTARA HEALTHCARE,<br><br>    Defendant.<br>_____ / | No. C 09-04210 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Sentara Healthcare's Motion to Dismiss for Lack of Personal Jurisdiction, to Dismiss for Improper Venue (or in the Alternative, to Transfer Venue), and to Dismiss for Failure to State a Claim** |

      Plaintiff BioGenex Laboratories ("BioGenex"), a California corporation headquartered in California, filed this action against defendant Sentara Healthcare, a Virginia corporation headquartered in Virginia. Before the court are Sentara's (1) motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(2), for lack of personal jurisdiction, (2) motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(3), for improper venue, or in the alternative to transfer venue to the Northern District of Virginia, and (3) motion to dismiss BioGenex's third, fourth and fifth claims for relief, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. Having considered the arguments of the parties and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

I.      The Agreements Between BioGenex and Sentara

BioGenex manufactures and provides cellular and molecular pathology laboratories with a broad range of reagents, detection kits, antibodies, probes, special stains and automated staining and imaging instrument systems. Docket No. 1 (Compl.) ¶ 5. Sentara is a not-for-profit healthcare facility that provides healthcare services to individuals in Southeastern Virginia. Docket No. 10-1 (Croswhite Aff.) ¶ 1. On June 29, 2006, BioGenex and Sentara entered into two agreements. Under the first, the "System Agreement," BioGenex would provide Sentara with seven i6000 Automated Staining System instruments and the supplies necessary to operate those machines in exchange for a promise that Sentara would purchase at least $194,000 of supplies annually for a five-year period. *See* Compl., Exh. A (System Usage and Reagent Supply Binding Agreement ("System Agreement")). Under the second, the "Service Agreement," BioGenex agreed to maintain the i6000 machines for five years in exchange for monthly payments of $5,200. *See* Compl., Exh. B (Service and Maintenance Agreement ("Service Agreement")). The two agreements were the product of arms length negotiations between executives at BioGenex and Sentara. BioGenex drafted the agreements, but both parties had opportunities to and did in fact alter some of the terms. *See* Service Agreement at 3-4 (exhibiting initialed interlineations made by Sentara's signatory to the agreement). On December 29, 2006, the parties entered into a "Superseding System Agreement," under which BioGenex provided Sentara with an additional i6000 machine, for a total of eight, and Sentara agreed to annually purchase at least $218,000 of supplies for the machines over a five year period beginning January 1, 2007. *See* Compl., Exh. C ( Instrument and Reagent Supply Binding Agreement ("Superseding System Agreement").

II.      Sentara's Alleged Breach

In May 2009, BioGenex learned that Sentara was using a competitor's instruments and reagent supplies in addition to BioGenex's. Compl. ¶ 9. On June 23, 2009, Sentara sent a Notice of Intent to Terminate the Contract for Material Breach to BioGenex, complaining about the performance of BioGenex's machines. *Id.* ¶ 10. BioGenex's disputed the performance deficiencies

identified by Sentara, but attempted to fix the problems within the thirty-day cure period provided for under the agreements. BioGenex alleges that during that thirty-day period, Sentara actively interfered with BioGenex's attempts to address Sentara's complaints. *Id.* ¶ 11. At some point before the expiration of the thirty-day period, Sentara terminated the contract and ordered BioGenex to remove all of its machines from Sentara's property. *Id.*

III.   Choice of Forum and Jurisdictional Provisions in the Agreements

The Superseding System Agreement and the Supply Agreement were the two contracts governing BioGenex and Sentara's relationship at the time of Sentara's alleged breach. Each of those agreements contains choice of law, forum selection and consent to jurisdictional clauses. Paragraph I of Appendix 2 to the Superseding System Agreement, entitled "GOVERNING LAW, JURISDICTION," relevantly states that:

> This Agreement shall be governed by the laws of the Commonwealth of Virginia as applied to agreement entered into between California residents and executed and performed in California. Any dispute arising out of or related to this Agreement shall be resolved based on the location of conflict and shall be resolved in courts with jurisdiction over said resolution. [Sentara] hereby consents to the jurisdiction of, venue in and process of service from the aforementioned courts.

Superseding System Agreement, Appx. 2, at ¶ I. The Service Agreement contains different terms covering similar subject matter. Paragraph 7 of Appendix 2 to the Service Agreement provides that:

> This Agreement shall be governed by the laws of the Commonwealth of Virginia without regard to its conflicts of laws. Any dispute arising out of or related to this Agreement shall be resolved solely in the U.S. District Court for the Northern District of California or in the state courts in Contra Costa County, California, and [Sentara] hereby consents to the jurisdiction of the aforementioned courts.

Service Agreement, Appx. 2, at ¶ 7.

LEGAL STANDARD

I.   Motion to Dismiss for Lack of Personal Jurisdiction (Rule 12(b)(2))

Plaintiff bears the burden of proving that the court may exercise personal jurisdiction over the defendant. *Schwarzenegger v. Fred Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). If the jurisdictional challenge is based solely on written papers, plaintiff must make a prima facie showing of jurisdiction. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements, Ltd.*, 328 F.3d 1122, 1129 (9th

3

Cir. 2003). While the plaintiff cannot rely solely on the complaint to establish personal jurisdiction, the court must take uncontroverted allegations as true and resolve conflicts between the facts contained in the parties affidavits in favor of the plaintiff. *American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). If, however, the court holds an evidentiary hearing on the issue, then the burden on the plaintiff increases to a preponderance of the evidence. *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 587 n.3 (9th Cir. 1993).

In a diversity action, the question of whether a federal court can exercise personal jurisdiction over a nonresident defendant "turns on two independent considerations: whether an applicable state rule or statute potentially confers personal jurisdiction over the defendant, and whether assertion of personal jurisdiction accords with constitutional principles of due process." *Data Disc, Inc. v. Syss. Tech. Assoc., Inc.*, 557 F.2d 1280, 1286 (9th Cir. 1977) (citing *Amba Mktg. Syss., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 786 (9th Cir. 1977)). Federal courts sitting in California may exercise personal jurisdiction over any nonresident defendant to the extent permitted by due process. *Harris Rutsky*, 328 F.3d at 1129 (citing Cal. Civ. Proc. Code § 410.10). The California Constitution imposes no greater restrictions on jurisdiction than does the due process clause of the United States Constitution. *Data Disc*, 557 F.2d at 1286-87 n.3. Accordingly, due process is satisfied if the defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

Personal jurisdiction is a "waivable right." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). One common way in which parties consent to personal jurisdiction is by "agree[ing] in advance to submit to the jurisdiction of a given court." *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964). "[P]articularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction." *Burger King*, 471 U.S. at 472 n.14. As long as waivers "have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process." *Id.* (quoting *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

4

Where the parties have not agreed to waive the personal jurisdiction requirement, the court may exercise either general or specific jurisdiction over a party. If a nonresident defendant has contacts with the forum state that are "substantial" or "continuous and systematic," then courts may exercise general personal jurisdiction over the defendant without regard to whether the action arises from the defendant's activities in the forum state. *Perkins v. Benguet*, 342 U.S. 437 (1952). If a nonresident defendant's activities within the forum state are less substantial, then courts may still exercise specific personal jurisdiction where the action arises out of or is related to the defendant's particular activities within the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

II.  <u>Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer Venue</u>

A motion under Rule 12(b)(3) to dismiss for improper venue may be brought to enforce a forum selection clause in a contract. *Offshore Sportswear, Inc. v. Vuarnet Intern., B.V.*, 114 F.3d 848, 851 (9th Cir. 1997). however, even if a case is properly situated in a particular forum, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A motion to transfer venue lies within the broad discretion of the district court, and must be determined on an individualized basis. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). The burden of showing that transfer is appropriate is on the moving party. *Carolina Casualty Co. v. Data Broad. Corp.*, 158 F. Supp. 2d 1044, 1048 (N.D. Cal. 2001) (Walker, J.).

District courts use a two-step analysis to determine whether a transfer is proper. The threshold question under section 1404(a) requires the court to determine whether the case could have been brought in the forum to which the transfer is sought. 28 U.S.C. § 1404(a); *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). If venue would be appropriate in the would-be transferee court, then the court must make an "individualized, case-by-case consideration of convenience and fairness." *Jones*, 211 F.3d at 498. Among the factors that a district court may consider in deciding whether a transfer is in the interest of justice are: (1) the location where the

5

1 relevant agreements were negotiated and executed; (2) the state that is most familiar with the
2 governing law; (3) the plaintiff's choice of forum; (4) the respective parties' contacts with the
3 forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the
4 differences in the costs of litigation in the two forums; (7) the availability of compulsory process to
5 compel attendance of unwilling non-party witnesses; (8) the ease of access to sources of proof; (9)
6 any forum selection clause; and (10) relevant public policy of the forum state. *Id.* at 498-99 (citing
7 *Stewart*, 487 U.S. at 29-31). This list of factors is non-exclusive. *See id.*

8 III.   <u>Motion to Dismiss for Failure to State a Claim (Rule 12(b)(6))</u>

9 Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a
10 defendant for failure to state a claim upon which relief can be granted against that defendant. A
11 motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*,
12 250 F.3d 729, 732 (9th Cir. 2001). Dismissal may be based on the lack of a cognizable legal theory
13 or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica*
14 *Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A motion to dismiss should be granted if a plaintiff
15 fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*
16 *Twombly*, 550 U.S. 544, 569 (2007). "The plausibility standard is not akin to a 'probability
17 requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."
18 *Ashcroft v. Iqbal*, ___ U.S. ____, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).
19 Allegations of material fact are taken as true and construed in the light most favorable to the
20 nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court
21 need not, however, accept as true pleadings that are no more than legal conclusions or the "formulaic
22 recitation of the elements" of a cause of action. *Iqbal*, 129 S. Ct. at 1950; *see also Sprewell v.*
23 *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Clegg v. Cult Awareness Network*, 18
24 F.3d 752, 754-55 (9th Cir. 1994). Although "[g]enerally, the scope of review on a motion to dismiss
25 for failure to state a claim is limited to the contents of the complaint," *Marder v. Lopez*, 450 F.3d
26 445, 448 (9th Cir. 2006), a court may consider "material which is properly submitted as part of the
27 complaint," *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th
28

6

Cir 1990). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

DISCUSSION

I. Personal Jurisdiction

Sentara argues that this court cannot exercise personal jurisdiction over Sentara because (1) it has not consented to personal jurisdiction in California and (2) it lacks the minimum contacts with California to support either specific or general personal jurisdiction. BioGenex concedes that it has not met its burden to establish that Sentara has sufficient minimum contacts with California, but asserts that Sentara consented to personal jurisdiction in California when it entered into the Supreseding System Agreement and the Service Agreement. Thus, the disposition of Sentara's motion to dismiss for lack of personal jurisdiction hinges entirely on whether Sentara consented to personal jurisdiction in California by agreeing to the terms of the Superseding System Agreement and the Service Agreement.

As a preliminary matter, the court must determine whether the two agreements constitute a single contract or represent two separate contracts. The two agreements evince a clear intent that Virginia law will govern their interpretation, and therefore the court applies Virginia contract law to determine whether the agreements should be treated jointly or separately. Under Virginia law,

> [w]here a business transaction is based on more than one document executed by the parties, the documents will be construed together to determine the intent of the parties, and [w]here two papers are executed at the same time or contemporaneously between the same parties in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument.

*Parr v. Alderwoods, Inc.*, 268 Va. 461, 467 (2004) (internal quotation marks and citations omitted). Here, the original System Agreement and the Service Agreement were executed on the same day and the Service Agreement internally references the System Agreement. *See* Service Agreement, Appx. 1 ("The Services provided under this Service Plan are performed under the terms and conditions of the Purchase, Lease, or System Rental and Reagent Agreement between BioGenex and [Sentara].").

7

Although the Superseding System Agreement altered some of the terms in the System Agreement (e.g., the number of instruments provided to Sentara, the value of the yearly mandatory-minimum purchase of supplies, and the dates covered by the agreement) and the parties did not enter into a corresponding Superseding Service Agreement, it seems clear that the parties intended the Superseding System Agreement and the Service Agreement to be construed as a single instrument. In addition, as far as the court can discern, the parties agree that the two instruments at issue in this case form a single contract. Accordingly, the court must interpret the provisions of the Superseding System Agreement and the Service Agreement as if they were part of a single contractual document.

Having reached the conclusion that the two agreements constitute one contract, the court must, if possible, determine the intent of the parties reflected by the choice of law, jurisdictional and venue provisions in the two agreements.

> Under settled contract principles, Virginia courts resolve contractual vagaries in one of three ways. First, if no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence. Second, if an ambiguity exists, a court should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence. Third, if an ambiguity renders the alleged agreement too indefinite—even after the consideration of extrinsic evidence—for the court to determine the parties' intent, the contract cannot be enforced due to the absence of any discernable meeting of the minds.

*Smith v. Smith*, 43 Va. App. 279, 287 (2004). "An ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Virginia Elec. and Power Co. v. Norfolk Southern Ry. Co.*, 278 Va. 444, 460 (2009). An ambiguity can either be "patent"—where "the language of the contract itself reveals that it can be interpreted in more than one way," *id.*—or "latent"—"where language while appearing perfectly clear at the time the contract [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways," *Galloway Corp. v. S.B. Ballard Constr.*, 250 Va. 493, 503 (1995) (quotations and citation marks omitted). "In determining whether the disputed terms are ambiguous, [a court] consider[s] the words employed . . . in accordance with their usual, ordinary and popular meaning." *Video Zone, Inc. v. KF & F Props.*, 267 Va. 621, 625-26 (2004). Further, "[w]hen two provisions of a contract seemingly conflict, if, without discarding either, they can be harmonized so as to

8

effectuate the intention of the parties as expressed in the contract considered as a whole, this should be done." *Plunkett v. Plunkett*, 271 Va. 162, 168 (2006) (quotation marks and citations omitted).

Here, the court is presented with one potential ambiguity—the language of the jurisdictional provision of the Superseding System Agreement—and two potentially conflicting terms in the contract—the different jurisdictional provisions in the Superseding System Agreement and the Service Agreement. As is discussed above, the Superseding System Agreement and the Service Agreement each contain one provision that addresses choice of law, venue and jurisdiction should a dispute related to either of the agreements arise. For ease of reference, the court reprints the provisions' language. The Service Agreement provides that:

> This Agreement shall be governed by the laws of the Commonwealth of Virginia without regard to its conflicts of laws. Any dispute arising out of or related to this Agreement shall be resolved solely in the U.S. District Court for the Northern District of California or in the state courts in Contra Costa County, California, and [Sentara] hereby consents to the jurisdiction of the aforementioned courts.

Service Agreement, Appx. 2, at ¶ 7. The Superseding System Agreement states that:

> This Agreement shall be governed by the laws of the Commonwealth of Virginia as applied to agreement entered into between California residents and executed and performed in California. Any dispute arising out of or related to this Agreement shall be resolved based on the location of conflict and shall be resolved in courts with jurisdiction over said resolution. [Sentara] hereby consents to the jurisdiction of, venue in and process of service from the aforementioned courts.

Superseding System Agreement, Appx. 2, at ¶ I. The parties agree that the choice of law provisions in the two agreements are in accord—Virginia law will apply to the resolution of any dispute between the parties. The parties dispute, however, whether the two provisions both provide for venue and Sentara's consent to personal jurisdiction in California.

The Service Agreement speaks clearly and unambiguously to all of the jurisdictional and venue question raised by Sentara's motion. Pursuant to that document, any disputes arising out of the Service Agreement will be resolved solely by courts in California and Sentara consents to personal jurisdiction in California.

In contrast to the Service Agreement's clarity, the venue and personal jurisdiction provision of the Superseding System Agreement serves an exemplar of how not to draft the terms of the contract; to call its nearly unintelligible terms ambiguous is a gross understatement. BioGenex

9

1 argues that the second half of the first sentence of the provision—starting with the words "as
2 applied"—evinces an intent that, for the purpose of the entire agreement, the parties will be treated
3 as California residents and performance of the contract will be deemed to have occurred in
4 California. It follows, BioGenex asserts, that any breach also occurred in California, making the
5 "location of conflict," which, pursuant to the third sentence, is determinative of venue, also in
6 California. Sentara, however, puts forward a conflicting interpretation of the provision. Sentara
7 contends that the first sentence speaks only to choice of law, and essentially means that Virginia law
8 will apply "[as it would be] applied to agreement entered into between California residents and
9 executed and performed in California." Sentara claims that the second and third sentences address
10 the venue and personal jurisdiction for the resolution of any dispute, specifying that "location of
11 conflict" determines where a lawsuit must proceed and where Sentara consents to personal
12 jurisdiction. They suggest that Virginia, where the alleged breach occurred, is the "location of
13 conflict."

14 The court holds that neither of the proposed interpretations is satisfactory. Instead, the court
15 rules that, as a result of the remarkably sloppy drafting of the provision, it possesses no discernible
16 meaning. The second sentence of the provision is legalese gibberish. Where is the "location of
17 conflict"? Is it where the parties are located, where the contract is being performed, or where the
18 alleged breach occurred? How exactly is a "dispute" resolved "*based on* the location of conflict"?
19 Further, the stipulation that "[a]ny dispute . . . shall be resolved in courts with jurisdiction over said
20 resolution" is a truism. As a matter of course, only a court with subject-matter jurisdiction over the
21 dispute could resolve the dispute. Accordingly, Sentara's proposed interpretation—that the
22 "location of conflict" refers to the location of alleged breach or performance, which is Virginia—is
23 inadequate. BioGenex's view of the provision fares no better. To hold that the intent of the parties
24 was to create the legal fiction that both entities were California residents performing the contract in
25 California would make the remainder of the jurisdictional provision useless. For if that were the
26 case, the "location of conflict" would necessarily have to be in California, and California would
27 necessarily be the only appropriate venue. Because neither proposed interpretation, nor any other

28

10

1 interpretation of which the court can conceive, provides any logical meaning to the provision as a
2 whole, the court holds that the jurisdictional provision of the Superseding System Agreement is
3 ambiguous.

4       A finding of ambiguity has two consequences. First, it entitles the parties to introduce parol
5 evidence to illuminate their intent in entering into the term. *See Nextel Wip Lease Corp. v.*
6 *Saunders*, 276 Va. 509, 519 (2008). This principle, however, is of no import in the instant dispute,
7 as neither party has submitted any parol evidence. The second principle, that the ambiguous
8 contractual provision be construed against the drafter (in this case BioGenex), is also of no help. *See*
9 *Donnelly v. Donatelli & Klein, Inc.*, 258 Va. 171, 183 (1999). Because the court has already held
10 that the provision is nonsensical, i.e., it possesses no discernable meaning at all, there is no possible
11 way to construe it against (or for) the drafter. The court reaches this conclusion despite the long-
12 standing principle that "[n]o word or clause in a contract will be treated as meaningless if a
13 reasonable meaning can be given to it." *Heron v. Trans. Cas. Ins. Co.*, 274 Va. 534, 539 (2007)
14 This is the exceedingly rare case in which there is no way to provide a *reasonable* meaning to the
15 provision without rendering some other portion of the provision meaningless. Consequently, the
16 court strikes the jurisdictional provision from the Superseding System Agreement.

17       Having excised the jurisdictional provision from the Superseding System Agreement, the
18 contract as a whole now contains a single, clear intent as to the location of venue and the
19 accompanying consent to personal jurisdiction. By entering into the Service Agreement, Sentara
20 explicitly agreed that any disputes arising out of or related to the contract would be venued in either
21 this court or the Superior Court for the County of Contra Costa. Sentara also "consent[ed] to the
22 jurisdiction of" either of those courts. Accordingly, because Sentara consented to personal
23 jurisdiction in this court, Sentara's motion to dismiss for lack of personal jurisdiction is DENIED.

24 II.    <u>Motion to Dismiss for Improper Venue</u>

25       Sentara's motion to dismiss for improper venue, under Federal Rule of Civil Procedure
26 12(b)(3), was predicated entirely on the potential ambiguities in the forum selection clauses in the
27 two agreements. Sentara concedes that if the contract contains an unambiguous forum selection
28

11

1  clause, that clause is valid. *See* Docket No. 17 (Sentara's Reply) at 5 ("Sentara does not argue that
2  the forum selection clause should not be upheld because it was induced by fraud, or based on issues
3  of public policy."). Having struck the forum selection clause from the Superseding System
4  Agreement, the forum selection clause in the Service Agreement is the governing provision in the
5  contract. As a result, this court is a proper venue for this litigation. Accordingly, Sentara's motion
6  to dismiss for improper venue is DENIED.

7  III.    Motion to Transfer Venue

8       Sentara argues that even if this court is a proper forum for this action, the court should
9  exercise its discretion to transfer the case to the Eastern District of Virginia. To determine whether
10 transfer is proper, the court must, as a threshold matter, determine whether the case could have been
11 brought in the Eastern District of Virginia. Plaintiff asserts that the Eastern District could not
12 resolve this dispute because it would not have personal jurisdiction over plaintiff. Personal
13 jurisdiction, however, is only an issue for defendants, not plaintiffs; a plaintiff who institutes a suit
14 cannot seek to avoid pursuing the suit in an alternative forum by arguing that the proposed forum
15 lacks personal jurisdiction over the plaintiff. Plaintiff also contends that the case could not have
16 been brought in Virginia because of the forum selection clause in its contract with Sentara, which
17 specifies that any dispute would be resolved in a California forum. As is discussed below, however,
18 a forum selection clause is only one factor, albeit a "significant [one] that figures centrally in the
19 district court's calculus," that a district court must consider in resolving a motion to transfer.
20 *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). Accordingly, the court holds that this
21 action could have been brought in the Eastern District of Virginia.

22      As a second step in the analysis, the court must weigh the various, non-exclusive factors
23 delineated in *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000). The court
24 addresses each in turn.

25      A.    The Location Where the Relevant Agreements Were Negotiated and Executed
26      As far as the court can discern, the contract at issue in this case was primarily negotiated in
27 Virginia, although it is possible that a representative from BioGenex executed the contract in
28
12

California.  *See* Docket No. 14-1 (Sheldon Dec.) ¶¶ 4-6 (declaring that David Sheldon, BioGenex's Chief Financial Officer, executed the agreements at issue in this case, and that Sheldon works in California).  In general, however, this factor would favor transfer to Virginia.

### B. The State that Is Most Familiar with the Governing Law

This factor strongly favors transfer to Virginia.  The parties clearly agreed that Virginia law would apply to the resolution of any dispute that arose out of their contract.  Although this court is capable of applying Virginia contract law, a district court in Virginia would be considerably more familiar with the relevant law.

### C. The Plaintiff's Choice of Forum

 "In general, a plaintiff's choice of forum carries substantial weight in a motion to transfer venue," especially where, as here, the plaintiff has some connection to the forum and the action is not a class action.  *Moore v. C.R. England, Inc.*, No. 09-1841 SC, 2009 WL 3458303, at 2 (N.D. Cal. Oct 23, 2009).  Accordingly, this factor strongly supports keeping this action before this court.

### D. The Respective Parties' Contacts with the Forum

This factor supports neither transfer nor retention.  BioGenex, which is headquartered in San Ramon, California, has strong connections with the Northern District.  Sentara, which is headquartered in Virginia, does not.

### E. The Contacts Relating to the Plaintiff's Cause of Action in the Chosen Forum

This factor favors transfer, as, according to the complaint, the vast majority of conduct giving rise to this dispute occurred at Sentara.

### F. The Difference in the Costs of Litigation in the Two Forums

This factor supports neither transfer nor retention.  Whether this case is tried in California or Virginia, one of the parties will be forced to litigate away from their state of residence, requiring them to incur some travel expense.  From the parties' moving papers, it appears that a slightly higher quantity of percipient witnesses are located in Virginia.  At the same time, the difference in costs is not appreciable, especially considering that both BioGenex and Sentara are large corporations capable of absorbing the cost of litigation.

14

G. The Availability of Compulsory Process to Compel Attendance of Unwilling Non-Party Witnesses

This factor weighs slightly in favor transfer to Virginia. BioGenex has non-party witnesses located both in California and outside of California. In contrast, Sentara contends that all of its non-party witnesses either reside or work in Virginia. Neither party has signified that this factor should feature prominently in the court's analysis.

H. The Ease of Access to Sources of Proof

BioGenex asserts that the machines at issue in this case are now located in California. It claims that the remainder of the relevant evidence is documentary, and thus favors neither California nor Virginia. Sentara asserts that the majority of witnesses and documents are located in Virginia, but admits that "[t]his factor is not hugely significant to either party." Docket No. 10 (Sentara's Mot.) at 17. Accordingly, this factor weighs slightly against transfer, but tilts the scales very little.

I. Any Forum Selection Clause

This factor heavily favors denying the motion to transfer venue. As is discussed at length above, the contract between BioGenex and Sentara contains a valid and unambiguous forum selection clause, specifying that any litigation must be brought in this court or in the Superior Court for the County of Contra Costa.

J. Public Policy of the Forum State

Neither party has identified any public policy of the state of California that would have any bearing on whether this case should be brought in California or Virginia. Accordingly, it weighs neither in favor or against transfer.

K. Analysis

In sum, four of the ten factors weigh in favor of transfer, while three favor denying Sentara's motion. Although the quantity of factors favors transfer, the court holds that transfer would not be appropriate in this case. Sentara has not demonstrated that "the convenience of parties" or "the interest of justice" would be better served in Virginia in a manner sufficient to disrupt the parties' choice of forum expressed in the forum selection clause. Accordingly, Sentara's motion to transfer this action to the Eastern District of Virginia is DENIED.

15

1 IV. Motion to Dismiss for Failure to State a Claim

2 Sentara also moves for this court to dismiss BioGenex's third, fourth and fifth claims for
3 relief, which allege that Sentara breached the implied covenant of good faith and fair dealing.
4 Sentara argues that Virginia does not recognize a breach of the implied covenant as an independent
5 cause of action, but rather only as a subset of breach of contract. Sentara asserts that therefore,
6 claims three through five are duplicative of counts one and two, which already allege breach of the
7 Superseding System and Service Agreements.

8 Sentara is correct that no cause of action for tortious violation of the implied covenant exists
9 in Virginia. *See Charles E. Brauer Co., Inc. v. NationsBank of Va.*, 251 Va. 28, 33 (1996). At the
10 same time, in Virginia, "every contract contains an implied covenant of good faith and fair dealing."
11 *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 451 (E.D. Va. 2009) (citing *Virginia
12 Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541-42 (4th Cir.1998)).[1] The implied
13 covenant cannot, however, "be used to override or modify explicit contractual terms." *Riggs Nat'l
14 Bank v. Linch*, 36 F.3d 370, 373 (4th Cir.1994); *see Ward's Equipment v. New Holland N.A.*, 254 Va.
15 379, 385 (1997) ("[An implied covenant of good faith and fair dealing] cannot be the vehicle for
16 rewriting an unambiguous contract in order to create duties that do not otherwise exist.").
17 Accordingly, "the elements of a claim for breach of an implied covenant of good faith and fair
18 dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied
19 covenant." *Enomoto*, 624 F. Supp. 2d at 451. A breach of the implied covenant generally occurs
20 when a party to a contract exercises its contractual discretion in bad faith. *See Virginia Vermiculite*,
21 156 F.3d at 542; *Clemons v. Home Savers, LLC*, 530 F. Supp. 2d 803, 812 (E.D. Va. 2008).
22 Therefore, although breach of the implied covenant is a contractual, not a tortious, cause of action,
23 conduct that violates the implied covenant must, as a matter of law, be different from conduct that
24 gives rise to a traditional breach of contract claim.

25 Such is the case in the instant matter. In its first and second claims for relief, BioGenex
26 alleges that Sentara breached the explicit terms of the Superseding System and Service Agreements.
27 In the third, fourth and fifth claims for relief, BioGenex avers that Sentara exercised its discretion

28

16

under the terms of the contract, but did so in bad faith. *See* Compl. ¶ 25 (alleging, in claim for relief three, that Sentara dishonestly blamed BioGenex for problems with the instruments that arose because of Sentara's failure to properly maintain the instruments); *id.* ¶ 31 (alleging, in claim for relief four, that Sentara disingenuously interfered with BioGenex's attempts to cure the breach of contract complained of by Sentara); *id.* ¶ 36 (alleging, in claim for relief five, that Sentara's termination of the contract was done in bad faith). These allegations are not duplicative of the allegations in claims for relief one and two. Sentara has not identified and the court has not been able to locate a single case in which a federal court dismissed an adequately pled claim for breach of the implied covenant simply because it was included in a complaint as a separate claim for relief. Accordingly, Sentara's motion to dismiss BioGenex's third, fourth and fifth claims for relief for failure to state a claim upon which relief could be granted is DENIED.

CONCLUSION

Defendant Sentara's motion to dismiss for lack of personal jurisdiction, motion to dismiss for improper venue, motion to transfer venue, and motion to dismiss for failure to state a claim upon which relief can be granted are DENIED. Defendant shall file an answer 30 days from the date of the filing of this order.

IT IS SO ORDERED.

Dated: 3/11/2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

# **ENDNOTES**

1. Sentara misleadingly cites to *Sneed v. American Bank Stationary Co.*, 764 F. Supp. 65, 67 (W.D. Va. 1991), for the proposition that the "[b]lack letter law of Virginia does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing." Sentara's Mot. at 18. Although *Sneed* could have been clearer on the issue, it, and the cases it cites to, hold only that the covenant is not implied into employment contracts, especially at-will employment contracts.